IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ELISHA SCHARTIGER,

        Plaintiff,

v.                              Civil Action No. 5:13-CV-71

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

**A. Background**

On June 5, 2013, Elisha Schartiger filed this claim under 42 U.S.C. §§ 405(g) and 1383(c) for judicial for review of the decision of the Commissioner of Social Security that denied her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 401-433, 1381-1383f.[1] The Commissioner filed her Answer on September 16, 2013.[2] Ms. Schartiger then filed her Motion for Summary Judgment on October 16, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on November 12, 2013.[4] The motions are now ripe for this Court's review, and for this report and recommendation.

**B. The Pleadings**

---

[1] Docket No. 1.

[2] Docket No. 4.

[3] Docket No. 7.

[4] Docket No. 10.

1. Ms. Schartiger's Motion for Summary Judgment and Memorandum in Support.

2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

**C. Recommendation**

I recommend that:

1.      Ms. Schartiger's Motion for Summary Judgment be **DENIED** because (1) substantial evidence supports the ALJ's finding that Ms. Schartiger's mental impairments were not severe; (2) the ALJ's RFC determination is supported by substantial evidence and adequately accounts for all of Ms. Schartiger's limitations; (3) the ALJ applied the correct legal standards in weighing the opinion evidence; and (4) any error at step four in finding that Ms. Schartiger had past relevant work as a telemarketer is harmless.

2.      Commissioner's Motion for Summary Judgment be  be **GRANTED** for the reasons set forth.

## II.  FACTS

**A. Procedural History**

On September 17, 2008, Ms. Schartiger applied for DIB and SSI alleging an onset of disability of October 15, 2007, due to back problems, rheumatoid arthritis, depression, diabetes, high blood pressure, tendonitis, lumbar sprain, and obesity. (R. 251, 254, 317.) The applications for benefits were initially denied on January 5, 2009, and upon reconsideration on July 23, 2009. (R. 64-66.) Ms. Schartiger requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 24, 2010. (R. 36-63, 149.) Ms. Schartiger, who was not represented by counsel,

testified at the hearing. (R. 36-63.) On June 25, 2010, the ALJ issued an unfavorable decision finding that Ms. Schartiger was not disabled because, although she has several severe impairments, there are jobs existing in significant numbers in the national economy that she can peform. (R. 71-80.) On July 9, 2010, Ms. Schartiger appealed this decision to the Appeals Council. (R. 405.) Before the Appeals Council issued a decision, Ms. Schartiger filed a subsequent DIB claim on August 24, 2010. (R. 97). On July 1, 2011, the Appeals Council remanded the case to the ALJs and directed the ALJ to associate the remanded claim and the subsequently filed claim. (R. 88-92.) A second hearing before the ALJ was held on August 3, 2012. (R. 12-35.) Ms. Schartiger, who was represented by counsel, testified at the hearing, as did an impartial Vocational Expert ("VE"). (*Id.*) On October 15, 2012, the ALJ again issued an unfavorable decision, and Ms. Schartiger again appealed the decision to the Appeals Council. (R. 7-10, 98-114.) On April 2, 2013, the Appeals Council denied review. (R. 1-6). Ms. Schartiger then timely brought her claim to this Court.

**B. Personal History**

Ms. Schartiger was born on May 20, 1980, making her 27 years old on the alleged disability onset date. She was recently married and has one step-son. She has a high-school education. Ms. Schartiger has previous work experience as a cashier, certified nursing assistant, factory worker, telemarketer, and tour guide.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Ms. Burner was not under a disability.

*1. Physical Health*

On March 10, 2006, Ms. Schartiger was treated at the emergency room of Monongalia

General Hospital ("Monongalia") for a neck sprain due to a motor-vehicle accident. (R. 1102.) A CT scan of her cervical spine did not show any fractures. (R. 1135.) On March 29, 2006, she returned to the Monongalia emergency room complaining of chest and neck pain. (R. 1083.) She was diagnosed with a cervical sprain and released with instructions to use heat for her neck pain and to follow up with her doctor is the pain persists. (R. 1062.)

On November 27, 2006, Mr. Schartiger reported to the Monongalia emergency room complaining of numbness, pain, and swelling in her right wrist and forearm. (R. 951-79.) She denied any injury, but reported that her job consisted of a lot of writing and typing. (R. 959.) A physical exam showed tenderness in the wrist and limited range of motion in the wrist, but full range of motion in the fingers. (*Id*.) The treating physician noted that he suspected carpel tunnel syndrome. (R. 960.) Ms. Schartiger was prescribed a splint to reduce motion of her wrist and ibuprofen for pain. (R. 955.) She was also advised to ice and elevate her wrist and to call her doctor for a follow-up evaluation. (*Id*.)

On November 29, 2006, Ms. Schartiger returned to the Monongalia emergency room with continuing right wrist pain. (R. 901-50.) An x-ray of the wrist revealed "no fracture, dislocation or bony abnormality. Soft tissues are not remarkable." (R. 950.) An x-ray of the right hand showed "no fracture or bony abnormality. Joint relationships are normal and the soft tissues are not remarkable." (R. 949.) A physical examination showed slight wrist tenderness and normal range of motion in the wrists and fingers. (R. 913.) Ms. Schartiger was diagnosed with possible carpal tunnel syndrome and over-use syndrome of right wrist. (R. 911, 913.) She was referred to Dr. Gregg O'Malley and given pain medication. (R. 911.) She was also advised not to return to work for one week. (*Id*.)

On April 17, 2007, Ms. Schartiger was seen at the Winchester Medical Center emergency

room for right wrist pain. (R. 757.) She reported that she fractured her right wrist in 2004, and since November of 2006, she has had intermittent pain in her right wrist. (*Id.*) A physical examination showed that she was "alert, oriented, in no acute distress." (*Id.*) Her right shoulder and forearm were nontender. (*Id.*) Her right wrist was mildly tender with some very slight swelling, but no redness or increased heat. The sensation to the hand was intact, and the strength in the hand was normal. (*Id.*) The treating physician's diagnostic impression was "Right wrist pain from carpal tunnel syndrome. She was given Motrin and Ultracet for pain. I gave her a Velcro wrist splint. I asked her to follow up with Dr. Swope for further evaluation." (R. 757-58.)

On May 12, 2007, Ms. Schartiger returned to the Winchester Medical Center emergency room for pain in her left lower back. (R. 746-55.) She reported pain in her lower back radiating down to the left buttocks. (R. 747.) She also reported a history of chronic back pain. (*Id.*) A physical exam showed mild tenderness in the left lateral lumbar spine, no crepitus, and no step-off. (R. 748.) The treating physician noted that Ms. Schartiger's "presentation is concerning for acute sciatica." (*Id.*) An x-ray of the lumbar spine demonstrated "normal alignment to the vertebral bodies with no evidence of fracture. There is degenerative disc disease at L3-4 and L4-5." (R. 755.) She was diagnosed with actue sciatica, degenerative disk disease, lumber spine, and obesity. (R. 749.)

On May 23, 2007, Ms. Schartiger was seen by Jeffrey Whyte, M.D., at QuadMed West Virginia Clinic for cough, congestion, and fever. (R. 1412.) During that office visit, she reported "intermittent chronic back pain and wondered what she could take for discomfort while at work." (*Id.*) Dr. Whyte prescribed naproxen and advised Ms. Schartiger to follow-up if the pain continued. (R. 1413.)

On June 19, 2007, Ms. Schartiger began regular visits with chiropractic physician Dr. Donald

L. Creek. (R. 1207-18.) She reported that her neck and lower back caused her the most pain and that she had experienced neck and lower back pain for three months. (R. 1207.) On June 20, 2007, Ms. Schartiger reported to Dr. Creek moderate pain in both the right and left lower back. (R. 1211.) Dr. Creek noted that she was "doing good, neck showing improvement, lower back some improvement." (*Id*.) On June 22, 2007, Ms. Schartiger reported to Dr. Creek that her left lower back "still hurts somewhat." (R. 1212.) She also estimated her percentage of recovery as 90%. (*Id*.) Dr. Creek noted that her "neck doing better, lower back improving. Overall she is doing a lot better." (*Id*.)

On July 20, 2007, Ms. Schartiger was treated at the QuadMed Clinic for bilateral leg and left foot swelling. (R. 1415.) She initially reported that she injured her foot while at work, but later stated that she noticed her left foot was swollen when she was getting ready for work that morning. (*Id*.) She also reported that "both of her legs have been swollen for a long time and are worse when standing for extended periods of time." (*Id*.) A physical exam showed 5+ pitting edema of the lower extremity. (R. 1416.) She was counseled about lifestyle modifications such as a healthy diet and regular daily exercise, and she was advised to follow up with Dr. Whyte for a physical examination. (*Id*.) Ms. Schartiger requested a note for a work absence that night because "her shoe is tight on foot and painful," but she was told to attend work as scheduled. (*Id*.)

On July 25, 2007, Ms. Schartiger returned to Dr. Creek and reported that her entire back and her hips were in severe pain. (R. 1213.) Dr. Creek noted a reaggravation of symptoms. (*Id*.) Also on July 25, 2007, Ms. Schartiger requested a medical leave of absence from her job as a finisher at Quad Graphics. (R. 1753-55.) Dr. Creek completed the health provider's portion of Ms. Schartiger's request for leave. (R. 1754-55.) Dr. Creek estimated that Ms. Schartiger would require two weeks of treatment for her back condition. (R. 1754.) He described her condition as "antalgic to the left and

her back is in spasms...acute lumbar sprain/strain." (*Id*.) He also noted that she "is unable to do any lifting, bending, and stretching at this time." (R. 1755.)

During a July 26, 2007 visit with Dr. Creek, Ms. Schartiger reported that her back was "a little sore...still hurts to walk and stand." (R. 1214.) Dr. Creek noted that her neck was doing better and that her lower back was great. (*Id*.) He also noted bilateral spasms in her lower back. (*Id*.) On July 30, 2007, Dr. Creek noted some improvement in the lower back and neck, however he also reported a "slow recovery." (R. 1215.) On August 7, 2007, Dr. Creek reported that Ms. Schartiger "continues to have a lot of tightness throughout her back causing her discomfort." (R. 1217.)

On August 9, 2007, Ms. Schartiger was seen by Dr. Whyte for a physical examination. (R. 1417-22.) She reported occasional left foot swelling especially "when she has been on feet for a long time." (R. 1417.) She also reported back pain. (R. 1419.) She denied experiencing headaches, numbness, tingling, or weakness. (*Id*.) A muscular-skeletal exam showed "Normally aligned cervical, thoracic and lumbar vertebral column. Nontender to palpation. No gross deformities or asymmetries." (R. 1420.) Dr. Whyte noted trace lower extremity edema at the ankles. (*Id*.) A neurologic exam revealed "Normal sensation, reflexes, coordination, muscle strength and tone." (*Id*.) Dr. Whyte diagnosed her with bilateral leg edema and noted that venous insufficiency and obesity were the likely causes. (R. 1421.) He prescribed furosemide for the swelling. (*Id*.)

On August 28, 2007, Ms. Schartiger returned to QuadMed Clinic for a follow-up consultation with Dr. Whyte. (R. 1423.) She reported that she continued to have leg swelling and also reported joint pain in her hands, wrists, ankles, toes, and right knee. (*Id*.) She expressed concern about rheumatoid arthritis because of her family history. (*Id*.) Dr. Whyte diagnosed Ms. Schartiger with polyarthralgia, noting that rheumatoid arthritis was a possibility given her strong family history

and that obesity was also playing a role in causing her joint pain. (R. 1425.) He referred Ms. Schartiger to rheumatology for an evaluation. (*Id.*)

Ms. Schartiger's last appointment with Dr. Creek was on October 15, 2007. (R. 1218.) She reported marked pain in her lower back, neck, and shoulders. (*Id.*) Dr. Creek noted that her "back condition has been reaggravated." He also noted that "she has been AWOL for over 2 months, came for excuse for reduced work load." (*Id.*)

Ms. Schartiger began regular diabetes check-ups with Nurse Practitioner Sheetz at Shenandoah Community Health Center on November 17, 2008. On her initial visit, she reported "arthritis pain in lower back, hips, knees, feet, ankles, shoulders, elbows, wrists, hands, & neck–family history of rheumatoid–requests check today." (R. 1219.) Nurse Sheetz prescribed pain medication and referred Ms. Schartiger for lab tests for the presence of rheumatoid factor and ANA (lupus). (R. 1221.) According to results of lab work conducted on November 17, 2008, Ms. Schartiger tested negative for both rheumatoid factor and ANA. (R. 1917, 1919.)

Two days later, on November 19, 2008, Kathleen Monderewicz, M.D., performed a consultative internal medicine examination of Ms. Schartiger. (R. 1160). Ms. Schartiger reported that recent lab testing "was positive for rheumatoid factor to confirm a diagnosis of rheumatoid arthritis." (*Id.*) She also indicated that she "had elevated ANA and so she will be undergoing further follow up to assess for possible lupus overlap." (*Id.*) A physical examination revealed the following:

> The claimant ambulates with a left limp and out toeing of the right foot with the right patella pointing laterally. The claimant does not require the use of a handheld assistive device. The claimant appears stable at station and comfortable in a sitting position, but uncomfortable in the supine position, as well as lying down and arising from the exam table with the claimant having to roll to her side to get up and down. Intellectual functioning appears normal

during the examination. The claimant's hearing appears to be adequate for normal conversation. Recent and remote memory for medical events is good and the claimant is considered reliable.

(R. 1162-63.) Dr. Monderewicz also noted "+1 to 2 pitting edema from the feet to midcalf level bilaterally." (R. 1163.) Regarding Ms. Schartiger's upper extremities, Dr. Monderewicz noted that:

Both shoulders have tenderness over the acromial clavicular joints, right side worse than left. The right shoulder also has tenderness along the upper trapezius muscle. The right elbow has tenderness around the olecranon with increased warmth over the joint, but no swelling or redness is over the right elbow. The left elbow does not have any tenderness, warmth, swelling, or erythema. No rheumatoid nodules are present. Both wrists are tender and the right wrist has swelling over the volar aspect. No swelling is detected over the left wrist. Tinel and Phalen's testing are positive at the right wrist. No crepitus is felt over any of the upper extremity joints.

(R. 1164.) An examination of Ms. Schartiger's hands revealed "no erythema or warmth." (*Id.*) However, "[b]oth hands have tenderness of the metacarpal phalangeal joints of the fingers, as well as the carpal metacarpal joints of both thumbs." (*Id.*) Dr. Monderewicz noted that Ms. Schartiger was able to make a fist bilaterally and that she could fully extend her hands. (*Id.*) Her grip strength measured 22 kilograms of force on the right hand and 10 kilograms of force on the left. (*Id.*) Ms. Schartiger was able to write with her dominant hand, and she could "pick up coins with either hand without difficulty." (*Id.*) Dr. Monderwicz also noted tenderness in both knees and the right ankle, but no tenderness in the left ankle. (*Id.*)

A neurological exam revealed the following:

Proximal motor strength in the right upper extremity is inhibited due to pain at 4/5 and right grip is a little stronger at +4/5. Motor strength in the left upper extremity is normal at 5/5 with the exception of slight weakness of left grip at +4/5. Motor strength is normal at 5/5 in both lower extremities. There is no atrophy noted. The claimant reports decreased sensation to pinprick over the median nerve

distribution of the right hand and decreased sensation to pinprick over the medial and dorsal aspects of the right foot. Sensation is grossly intact elsewhere....Toe walking increased the low back pain. Heel walking caused increased pain over the heels and also caused complaint of a catching pain in the legs that radiated up to the back. When the claimant attempted to perform tandem gait with a narrow base there was persistent out toeing of the right foot and the claimant had difficulty circumducting the lower extremities due to obesity causing the knees and thighs to rub together. The clamant squatted two-thirds of the way due to increased low back and leg pain.

(R. 1165. Dr. Monderewicz summarized her findings as follows:

The claimant should avoid maintaining her legs in a prolonged dependent position with sitting and standing due to lower extremity edema. Prolonged sitting and standing, as well as walking, bending, squatting, kneeling, crawling, lifting, and carrying are limited by chronic back pain, cervical strain, and arthritis of the lower extremity joints. Use of the upper extremities for reaching, pushing, pulling, and overhead use is limited by arthritis in the shoulders, elbows, and wrist. The claimant is still able to handle objects with fine manipulation bilaterally. The claimant should not climb or attempt heights due to unsteady balance, which is probably a combination of joint pain plus the claimant's morbid obesity. There is no limitation of hearing or speech.

(R. 1167.)

On December 5, 2008, Ms. Schartiger returned to Shenandoah to follow-up regarding joint pain. (R. 1222.) She reported that the pain medication was working well. (*Id*.) Ms. Schartiger saw Nurse Sheetz again on January 5, 2009, but did not complain of pain. (R. 1225.) A review of systems on that date revealed no gait disturbance. (*Id*.)

Ms. Schartiger did not mention any pain during visits with Nurse Sheetz occurring on February 9, 2009 and February 25, 2009. Ms. Schartiger did complain of back pain on May 11, 2009, however a review of systems showed no bone/joint symptoms or weakness. (R. 1579.) Nurse Sheetz noted tenderness in lumbar spine and reported that Ms. Schartiger was "Moving around exam

room without any noted difficulty. Able to get on exam table without assistance." (*Id*.) Ms. Schartiger did not complain of pain during an appointment on July 23, 2009. On August 10, 2009, Ms. Schartiger reported to Nurse Sheetz that she was walking one mile in the morning and one mile in the evening and that "walking is getting easier since first started walking in the middle of July." (R. 1572.)

On September 15, 2009, Ms. Schartiger was seen by Nurse Sheetz and complained of lower back pain and right wrist pain. (R. 1569.) She reported that the back pain radiates to her thighs and that the pain is relieved by heat. (*Id*.) She also noted that the wrist pain gets worse when she uses her hand and that her wrist swells at night. She reported that the wrist pain has been going on for a year and that it is getting worse. (*Id*.) A physical exam revealed tenderness in the lumbar spine and moderate pain with motion. (R. 1570.) Additionally, the right hand had a positive Tinel's sign. (*Id*.) Ms. Schartiger's extremities appeared normal with no edema or cyanosis. (*Id*.) Nurse Sheetz assessed Ms. Schartiger as having non-specified back pain and carpal tunnel syndrome. She prescribed flexeril and darvocet for the pain and directed Ms. Schartiger to wear a wrist splint for one month. (*Id*.) Nurse Sheetz also referred Ms. Schartiger for back x-rays. (R. 1234.) The x-ray of Ms. Schartiger's lumbar spine revealed: "Good alignment. Degenerative changes involving the disc space of L3-L4 with narrowing of the disc space and associated end plate sclerosis and anterior osteophytosis. The facet joints show sclerotic changes at L5-S1 bilaterally." (*Id*.)

On October 15, 2009, Ms. Schartiger was seen by Nurse Sheetz for a monthly check-up. (R. 1566.) She reported continuing lower-back pain and stated that her current pain medication was not working. (*Id*.) Nurse Sheetz prescribed diclofenac and noted "if pain persists will refer to pain management." (R. 1568.)

Ms. Schartiger next visited Nurse Sheetz on November 10, 2009. She did not complain of pain and a physical exam revealed no edema. (R. 1563.) On November 18, 2009, Ms. Schartiger was seen by Nurse Sheetz for a laceration of the forehead. (R. 1560.) Ms. Schartiger reported that "she was shooting at a target and the gun kicked and scope hit her forehead." (*Id.*)

On December 17, 2009, Ms. Schartiger was seen by Nurse Sheetz for a monthly exam and a disability physical. (R. 1554.) Ms. Schartiger brought Nurse Sheetz a note stating "my back hurts worse now with my right shoulder. My right hand is numb and feels like it is on fire all the time. I can't work due to my back. I can't sit or lay for long periods of time." (*Id.*) A review of systems showed no gait disturbance. (R. 1555.) A physical exam revealed no skeletal tenderness or deformity, but did show tenderness in the lumbar spine. (R. 1556.) Nurse Sheetz noted that Ms. Schartiger's extremities appeared normal with no edema or cyanosis. (*Id.*) Nurse Sheetz also noted that Ms. Schartiger "moves to and from exam table without difficulty–minimal assistance with changing positions from sitting to lying and back to sitting." (*Id.*)

Ms. Schartiger's next visit with Nurse Sheetz was on March 1, 2010. She complained of multiple joint pain in legs, right shoulder, lower back, and wrists. (R. 1551.) She reported that it was difficult to get out of bed in the morning because of the joint pain. (*Id.*) Nurse Sheetz noted that "previous testing for lupus and RA negative." (*Id.*) A physical exam showed no edema in the extremities, and Nurse Sheetz noted that Ms. Schartiger was "able to get to and onto exam table without assistance." (R. 1552.) Nurse Sheetz referred Ms. Schartiger to rheumatology for a full evaluation. (R. 1553.)

On April 21, 2010, Ms. Schartiger began seeing Dr. Catherine Silver-Riddell, D.C. for evaluation and treatment of pain and numbness. (R. 1241.) On her initial exam, Ms. Schartiger

reported difficulty walking and moving, neck stiffness and pain, and numbness and weakness. (R. 1244.) On April 23, 2010, Ms. Schartiger reported to Dr. Silver-Riddell that she felt a lot better with less numbness in her hands and feet. (R. 1246-48). On April 26, 2010, Ms. Schartiger noted that she felt much worse and that her left hip, hands, and feet were numb again. (R. 1249.) On April 28, 2010, Ms. Schartiger reported that "I can now sleep all night without numbness in my hands waking me up." (R. 1252.) On April 30, 2010, Ms. Schartiger reported that she was improving and that she had joined a gym. (R. 1253-54.)

On May 5, 2010, Ms. Schartiger began regular visits with rheumatologist Michael Rezaian, M.D. On her initial visit, Ms. Schartiger reported the following symptoms:

> She has pain and stiffness in both hands and wrists with numbness with flare-up, both elbows, both right and left shoulders, that have been getting worse. She also has pain as well as stiffness in upper back and neck on both sides, lower back more on the left side, both the right and left hips with difficulty laying on these hips although the left hip is the one causing most of the pain and the stiffness in this case, that also been getting worse. There is pain and stiffness in right and left knees with difficulty standing and walking, right ankle, left ankle, with numbness of feet with standing. Her pain tend [sic] to get worse by the end of the day. She does have more pain at night. She does have morning stiffness. She does have stiffness with sitting and rest.

(R. 1323.) A physical examination on that date revealed a normal station and a painful, slow gait. (R. 1327.) Dr. Rezaian also noted that Ms. Schartiger was "having difficulty getting around." (*Id*.) He noted reduced muscle tone and 5/5 muscle strength. (*Id*.) Her coordination was good with no localized motor or sensory deficits. (*Id*.) A joint exam revealed the following:

> DIPs: no tenderness or swelling
> PIPs: bilateral tenderness with normal range of motion
> MCPs: tenderness on both sides with normal range of motion
> Wrists: bilateral tenderness with normal range of motion
> Elbows: tenderness on both sides with good range of motion

Shoulders: tenderness on both sides with good range of motion
C-Spine: significant bilateral fullness and tenderness with limited range of motion in all planes due to pain
TMJ: nontender with good range of motion
T-Spine: paraspinal tenderness
L-Spine: bilateral tenderness with decrease in flexion
SI: bilateral tenderness
Hips: tenderness over the trochanteric bursa with some limitation in range of motion due to pain
Knees: tenderness on both sides with normal range of motion
Ankles: tenderness but normal range of motion
MTPs: tenderness but good range of motion

(R. 1327.) Based on a review of Ms. Schartiger's medical history and the physical examination, Dr. Rezaian listed his diagnostic impressions as seronegative arthritis, fibromyalgia, chronic pain, arthralgias, generalized stiffness, epicondylitis, and trochanteric bursitis. (R. 1321.) Dr. Rezaian recommended that Ms. Schartiger obtain blood tests and hip x-rays for further evaluation. (R. 1322.) He also recommended weight loss for pain relief, conditioning, and prevention of joint damage. (*Id.*)

On May 6, 2010, Ms. Schartiger underwent lab work to test for lupus and rheumatoid arthritis. (R. 1331, 1518-23.) An ANA screen was positive and a rheumatoid factor test was negative. (R. 1331, 1518, 1523.) Also on May 6, 2010, Ms. Schartiger underwent hip and pelvis x-rays. (R. 1329.) The x-rays revealed no abnormalities or dislocation. (*Id.*) On May 20, 2010, Ms. Schartiger was seen by Dr. Rezaian to discuss her recent lab tests and x-rays. (R. 1316-20.) Dr. Rezaian noted the positive ANA result and ordered more blood tests for further evaluation. (R. 1316.) He also recommended that Ms. Schartiger consult with Dr. Varga for the numbness in her extremities. (*Id.*) Also on May 20, 2010, Ms. Schartiger underwent more lab testing as directed by Dr. Rezaian. (R. 1700.) On June 1, 2010, Ms. Schartiger was seen by Dr. Rezaian. (R. 1312-25.) He reviewed her most recent serologic testing results, and diagnosed her with systemic lupus. (R. 1312.) A physical exam revealed that Ms. Schartiger was "overall about the same compared to the last

14

evaluation with not much change in terms of pain or stiffness." (R. 1312-13.)

On June 8, 2010, Ms. Schartiger was seen by Karoly Varga, M.D. at Panhandle Neurology Center. (R. 1678.) Dr. Varga noted that Ms. Schartiger was referred by Dr. Rezaian for numbness in the extremities. (*Id*.) Ms. Schartiger reported experiencing numbness and tingling in her knees and feet that occurs whether sitting or standing. (*Id*.) She also stated that she feels like she has poor balance and occasionally falls. (*Id*.) She also complained of numbness in her arms from the wrists to the elbows. (*Id*.) She reported that "her left elbow gets numb on long drives where she leans on it, and her right arm gets numb when she holds the telephone. Has some tingling pain solely in the right index finger occurring intermittently. Denies any weakness in the hands or neck pain." (*Id*.)

Dr. Varga performed a physical examination, which revealed the following:

> Extremities: symmetrical without trophic changes, pulse deficits, edema or cyanosis
>
> Motor Examination: 5/5 all without atrophy, abnormal tone, or movements
>
> Reflexes: Absent LE DTR, No ankle clonus, no babinski
>
> Sensation: intact pin, temperature, vibration x 4 extr, Romberg negative
>
> Cerebellar Function: no limb ataxia; heel, toe and tandem gait without difficulty
>
> Gait and Station: normal gait, able to stand without difficulty
>
> Back: Diffuse mild tenderness left buttock
>
> Straight Leg Raise: negative

(R. 1679-80.) Dr. Varga ordered nerve testing and direct Ms. Schartiger to return once the testing was completed. (R. 1680-81.) Ms. Schartiger saw Dr. Varga again on June 28, 2010. Based on the

recent testing and examinations, Dr. Varga diagnosed Ms. Schartiger with chronic axonal sensorimotor peripheral polyneuropathy, paresthesia in the upper extremities, and chronic l/s multilevel radiculopathy. (R. 1294.)

On July 14, 2010, Ms. Schartiger underwent an electromyogram (EMG) and a nerve conduction study. (R. 1291-92.) The EDX findings were "consistent with bilateral median neuropathies at the wrists" indicating carpal tunnel syndrome. (R. 1291.) On July 19, 2010, Ms. Schartiger was seen by Dr. Varga. She complained of imbalance and requested an assistive device to help maintain balance. (R. 1287.) She denied any lower back pain. (*Id*.) A physical examination revealed no edema of the extremities, normal gait, and the ability to stand without difficulty. (R. 1289.) Dr. Varga diagnosed Ms. Schartiger with carpal tunnel syndrome and referred her to physical therapy and orthopaedics. She also prescribed Ms. Schartiger a cane. (R. 1290.)

On July 29, 2010, Ms. Schartiger was seen by Troy Foster, D.O. at Tri-State Surgical Center for a carpal tunnel syndrome consultation. (R. 1607.) A physical examination revealed positive median nerve compression tests of the right wrist. (*Id*.) Dr. Foster diagnosed Ms. Schartiger with carpal tunnel syndrome, right greater than left. He also noted "we are going to proceed with surgical release to her right hand." (*Id*.)

Ms. Schartiger was seen by Tim Hull, P.T. at WVU Hospital for a physical therapy appointment on August 19, 2010. (R. 1609-12.) She reported that she recently started falling and that she falls ten times per week. (R. 1610.) Dr. Hull noted that her strength was weak in both legs. (*Id*.) He also noted an absence "of protective sensation circumferentially the entire legs from her knees down...it is the same on her arms." (*Id*.) Dr. Hull assessed Ms. Schartiger's static and dynamic sitting balance ability as normal, her static standing balance ability as good, and her dynamic standing

balance ability as fair. (R. 1611.) He further noted that Ms. Schartiger "seems to have poor proproceptive awareness in both legs...also her leg strength is weak which makes adjustment very difficult for her if she starts to stumble." (*Id*.) Dr. Hull's assessment was that Ms. Schartiger "will need more support than her standard cane," and he suggested a three-wheeled rolling walker. (*Id*.) He noted that she seemed "weak, deconditioned, with poor leg somtosensory awareness." (*Id*.)

On August 20, 2010, Ms. Schartiger underwent surgery for right hand carpal tunnel syndrome. (R. 1606.) Dr. Foster performed a release of deep transverse carpal ligament. (*Id*.) On September 2, 2010, Dr. Foster noted that Ms. Schartiger was "doing excellent" after the right hand carpal tunnel release. (R. 1605.) Dr. Foster also noted that "she wants to have the other side done now. We are going to proceed with release of her carpal ligament to her left hand." (*Id*.)

On September 20, 2010, Ms. Schartiger returned to Dr. Varga for a follow-up examination. (R. 1283-86.) She complained of numbness, but denied any lower back pain. (R. 1283.) She also complained of imbalance and requested an assistive device to help maintain balance. (*Id*.) Dr. Varga noted that the physical therapist recommended a wheeled walker. (*Id*.) Dr. Varga also noted that Ms. Schartiger "lost 94 lbs since last year and A1C is 5.1!!!" (*Id*.) Ms. Schartiger denied any joint pain, joint swelling, muscular weakness, or neck pain. (R. 1285.) A physical examination showed no edema of the extremities and heel, toe and tandem gait without difficulty. (*Id*.) A motor examination revealed "5/5 all without atrophy, abnormal tone or movements." (*Id*.) Ms. Schartiger's gait and station were assessed as "wide based, using cane." (*Id*.) Dr. Varga prescribed a wheeled walker and directed Ms. Schartiger to return for a follow-up examination in two months. (R. 1286.)

Ms. Schartiger was seen by Dr. Rezaian on October 4, 2010. (R. 1306-10.) She reported no improvement with regard to pain, stiffness, and swelling. (R. 1306.) A physical examination

revealed normal station and slow painful gait. (R. 1309.) A joint examination showed no swelling and normal to good range of motion in all joints except the C-Spine, which had limited range of motion in all planes. (R. 1309-10.) Dr. Rezaian suggested starting treatment with lyrica. (R. 1306.)

On October 13, 2010, Ms. Schartiger was seen at the emergency room of WVU Hospitals-East for left knee and leg pain. (R. 1587.) Ms. Schartiger reported that the pain was worse when she stands up and walks around on her leg. (R. 1589.) She denied any weakness, numbness, or swelling. (*Id.*) A physical examination showed that "the left knee was tender though there is no effusion. Most of the tenderness was actually located posteriorly. The skin was normal. She tolerates passive range of motion reasonably well but does have some pain with this, though there is no ligamentous instability." (R. 1590.) A venous doppler of the left lower extremity was negative for deep vein thrombosis. (*Id.*) Ms. Schartiger was given a knee immobilizer and instructed to follow-up with orthopaedics. (*Id.*)

On February 3, 2011, Ms. Schartiger was seen by Dr. Rezaian. (R. 1389-93.) She complained of pain, stiffness, and swelling. Dr. Rezaian noted no improvement in her condition and ordered more blood tests for evaluation. (R. 1389.) Ms. Schartiger was seen by Dr. Varga on April 6, 2011. (R. 1342-45.) She was using a wheeled walker and complained of numbness in her feet and legs. (R. 1342.) She reported that she stopped taking Neurontin for dysthesias because it made her too confused. (*Id.*) She also reported that the numbness and tingling in her right hand were returning despite the carpal tunnel surgery. (*Id.*) She complained of recent episodes of "spinning" where "she feels like she's going to pass out, but hasn't had any loss of consciousness." (*Id.*) She also reported recent hearing loss in her right ear. (*Id.*) She denied any joint pain, joint swelling, muscular weakness, back pain, or neck pain. (R. 1344.)

On June 2, 2011, Ms. Schartiger was seen by Dr. Rezaian. (R. 1384-88.) She reported worsening pain, stiffness, and swelling. (R. 1384.) Dr. Rezaian noted that "she is worse overall compared to before." (R. 1385.) A physical examination revealed no changes since the last visit. (R. 1386-87.) Ms. Schartiger was seen by Dr. Rezaian on August 17, 2011, November 15, 2011, and December 19, 2011. (R. 1371-83.) She reported worsening symptoms, and Dr. Rezaian noted no changes in her condition. (*Id*.)

On January 18, 2012, Ms. Schartiger was seen Dr. Whyte at Quadmed for a physical examination. (R. 1459.) She complained of swelling in her hands and feet. (R. 1460.) A physical examination showed 1+ pitting edema bilaterally to mid-shin. (R. 1461.) She was diagnosed with venous insufficiency. (R. 1463.) Dr. Whyte "explained that weight loss would be beneficial" and prescribed furosemide. (*Id*.) Dr. Whyte also discussed the possibility of compression stockings. (*Id*.)

On February 14, 2012 and June 22, 2102, Ms. Schartiger was seen by Dr. Rezaian. (R. 1368-70, 1642-46.) On February 14, 2012, he noted "overall patient appears to be about the same without much change in overall symptoms compared to before." (R. 1368.) On June 22, 2012, he stated, "overall she is worse." (R. 1642.) On July 18, 2012, Ms. Schartiger was seen by Dr. Whyte for a diabetes follow-up examination. (R. 1630.) She reported that she was walking one mile daily. (R. 1631.) During a July 23, 2012, follow-up with Dr. Whyte, she reported "doing some hiking." (R. 1638.)

d. Physical RFC Assessments

On December 8, 2008, Rogelio Lim, M.D., prepared a physical RFC assessment. (R. 1170.) Dr. Lim found Ms. Schartiger to have the following exertional limitations: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for a total

of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; (5) push and/or pull unlimited, other than as shown for lift and/or carry. (R. 1171.) Dr. Lim found Ms. Schartiger to have the following postural limitations: (1) occasionally climb ramps or stairs; (2) never climb ladders, ropes, or scaffolds; (3) occasionally balance; (4) occasionally stoop; (5) occasionally kneel; (6) occasionally crouch; (7) occasionally crawl. (R. 1172.) Dr. Lim noted the following manipulative limitations: (1) mild limitations in reaching in all directions; (2) unlimited handling; (3) unlimited fingering. (R. 1173.) Dr. Lim noted no visual or communicative limitations. He found that Ms. Schartiger had the following environmental limitations: (1) extreme cold–avoid concentrated exposure; (2) extreme heat– avoid concentrated exposure; (3) wetness–unlimited; (4) humidity–unlimited; (5) noise–unlimited; (6) vibration–avoid concentrated exposure; (7) fumes, odors, dusts, gases, poor ventilation, etc.–unlimited; (8) hazards–avoid concentrated exposure. (R. 1174.) Dr. Lim concluded that Ms. Schartiger's reported limitations were generally credible, but not fully supported by the medical evidence. (R. 1177.)

On July 16, 2009, Thomas Lauderman, DO, prepared a physical RFC assessment. (R. 1192-99.) Dr. Lauderman found the following exertional limitations: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; (5) push and/or pull unlimited, other than as shown for lift and/or carry. (R. 1193.) He found that Ms. Schartiger had the following postural limitations: (1) occasionally climb ramps or stairs; (2) never climb ladders, ropes, or scaffolds; (3) occasionally balance; (4) occasionally stoop; (5) occasionally kneel; (6) occasionally crouch; (7) occasionally crawl. (R. 1194.) Unlike Dr. Lim, Dr. Lauderman opined that Ms. Schartiger had no manipulative limitations. (R. 1195.) Like Dr. Lim, Dr. Lauderman found that

Ms. Schartiger had no visual or communicative limitations. (R. 1195-96.) Dr. Lauderman also found that Ms. Schartiger had the following environmental limitations: (1) extreme cold–avoid concentrated exposure; (2) extreme heat– avoid concentrated exposure; (3) wetness–unlimited; (4) humidity–unlimited; (5) noise–unlimited; (6) vibration–avoid concentrated exposure; (7) fumes, odors, dusts, gases, poor ventilation, etc.–unlimited; (8) hazards–avoid all exposure. (R. 1196.) Dr. Lauderman also noted that the medical evidence "supports some limitations, such as difficulty bending, but reported limitations seem somewhat exaggerated, such as inability to lift a gallon of milk, difficulty using hands, inability to wash self or put undergarments on. The claimant is partially credible." (R. 1197.)

On October 13, 2010, Richard L. McCullough prepared a physical RFC assessment. (R. 1840-47.) Dr. McCullough found that Ms. Schartiger had the same exertional and postural limitations determined by Dr. Lim and Dr. Lauderman. (R. 1841.) Dr. McCullough also noted no manipulative limitations. (R. 1842.) He noted no environmental limitations except that Ms. Schartiger should avoid concentrated exposure to hazards. (R. 1844.) Dr. McCullough summarized his findings as follows:

> The claimant did not return the adult function report and her report of functional limitations are unknown. The medical evidence is inconsistent and she is currently waiting for an appeals council decision on a prior claim. The ALJ determined she could do sedentary work with postural and environmental limitations. The current MER supports she could do light work with postural and environmental limitations. She has normal strength, normal range of motion, normal gait, normal station, and normal coordination. At one exam, she had tenderness and swelling, but at another, she did not. She is morbidly obese at 296 lbs. A straight leg raise test was negative and she is able to stand without difficulty. Nerve conduction studies did show findings consistent with carpal tunnel syndrome. The RFC is light exertional level with postural and environmental limitations.

(R. 1845.)

On March 15, 2011, Porfirio Pascasio, M.D., prepared a physical RFC assessment. (R. 2073-80.) Dr. Pascasio noted the following exertional limitations: (1) occasionally lift and/or carry 10 pounds; (2) frequently lift and/or carry 10 pounds; (3) stand and/or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; (5) push and/or pull unlimited, other than as shown for lift and/or carry. (R. 2074.) He found that Ms. Schartiger had the following postural limitations: (1) occasionally climb ramps or stairs; (2) never climb ladders, ropes, or scaffolds; (3) occasionally balance; (4) occasionally stoop; (5) occasionally kneel; (6) occasionally crouch; (7) occasionally crawl. (R. 2075.) Dr. Pascasio noted that Ms. Schartiger had no manipulative, visual, or communicative limitations. (R. 2076-77.) Dr. Pascasio also found that Ms. Schartiger had the following environmental limitations: (1) extreme cold–avoid concentrated exposure; (2) extreme heat–avoid concentrated exposure; (3) wetness–unlimited; (4) humidity–unlimited; (5) noise–unlimited; (6) vibration–unlimited; (7) fumes, odors, dusts, gases, poor ventilation, etc.–unlimited; (8) hazards–avoid even moderate exposure. (R. 2077.) Finally, Dr. Pascasio summarized his findings by stating: "ALJ reduced claimant to sedentary work with occasional clibing [sic], balancing, sttoping [sic], kneeling, crouching, and crawling. Avoid concentrated exposure to workplace hazards. I agree with ALJ." (R. 2078.)

On June 12, 2012, Dr. Rezaian completed a Medical Questionnaire to Determine Physical Capacities. (R. 1338-41.) Dr. Rezaian opined that in an 8-hour workday, Ms. Schartiger could sit for 2 hours, stand for 1 hour, and walk for 1 hour. (R. 1338.) He also noted that Ms. Schartiger required a cane and a walker in order to stand and walk and that she must frequenlty alternate positions. (*Id*.) He further stated that she was required to elevate both feet. (*Id*.) Dr. Rezaian noted

that Ms. Schartiger could not bend, stoop, crawl, climb, crouch, kneel, or reach, but that she could balance. (R. 1339.) He also stated that she could not use either foot for pushing or pulling. (*Id.*) He noted that Ms. Schartiger could occasionally lift up to 10 pounds, but that she could never lift more than 10 pounds. (*Id.*) As for Ms. Schartiger's hands, Dr. Rezaian opined that she could not perform simple grasping, arm controls, or fine manipulation. (*Id.*) He noted that Ms. Schartiger would be required complete freedom to rest frequently throughout the day and that it would be necessary for her to lie down or sit on a recliner for a substantial period of time during the day. (R. 1340.) Dr. Rezaian also opined that Ms. Schartiger's limitations were permanent. (R. 1341.)

*2. Mental Impairments*

a. West Virginia University Hospital Center for Diabetes Endocrinology & Metabolism

On February 1, 2008, Ms. Schartiger had an initial consultation at the Center for Diabetes Endocrinology & Metabolism at West Virginia University Hospital-East. (R. 777-78.) She reported a recent miscarriage, as well as previous treatment for depression. (*Id.*) Dr. Philip Ryan diagnosed her with depression and prescribed prozac. (*Id.*)

b. Shanandoah Community Health Center-Nurse Sheetz/Dr. Jones

On November 17, 2008, Ms. Schartiger was seen for the first time by Nurse Practitioner Michelle Sheetz at the Shenandoah Community Health Center ("Shenandoah"). Ms. Schartiger reported a history of depression and stated that "she feels like it is getting worse–prozac not working, never taken anything else." (R. 1219.) Nurse Sheetz diagnosed depression and prescribed lexapro to replace the prozac. (R. 1221.) Ms. Schartiger returned to Shenandoah for a follow-up exam on December 5, 2008. (R. 1222.) She reported that she was feeling better. (*Id.*) A neuro/psychiatric exam showed that she was positive for "appropriate interaction" and "psychiatric

23

symptoms." (*Id.*) Her depression score was 13. (*Id.*) Nurse Sheetz directed Ms. Schartiger to continue lexapro and to return in one month to assess her response. (R. 1223.) Ms. Schartiger returned to Shenandoah on January 5, 2009. (R. 1225-27.) A neuro/psychiatric review showed that she was positive for "appropriate interaction" and negative for "psychiatric symptoms." A psychiatric exam revealed that she was "oriented to time, place, person, and situation," her affect was normal, and she was not anxious. She was also noted as having "normal attention span and concentration, does not have pressured speech, and does not have suicidal ideation." (R. 1226.) Her depression score on this date was 9. (*Id.*) She was directed to continue lexapro and to return to the clinic in three months. (*Id.*)

Ms. Schartiger returned to Shenandoah on February 9, 2009, and reported that the lexapro was not working and that she was "feeling increasingly irritable." (R. 1584). Her depression screening score was 9. (R. 1585). Nurse Sheetz discontinued lexapro and prescribed zoloft. (*Id.*) Ms. Schartiger was seen at Shenandoah again on February 25, 2009 and May 11, 2009, but no mention was made of the depression diagnosis or treatment on those dates. (R. 1578-83.) On July 23, 2009, Ms. Schartiger was seen at Shenandoah for an office visit and reported a recent onset of depression. (R. 1575.) She reported that "it is somewhat difficult to meet home, work, or social obligations." (*Id.*) She also stated that she was "experiencing irritable mood, diminished interest or pleasure, fatigue or loss of energy, feelings of guilt or worthlessness, restlessness or sluggishness, sleep disturbance and thoughts of death." (*Id.*) She denied any anxiety, hallucinations, manic episodes, panic attacks, poor concentration or indecisiveness, and thoughts of suicide. (*Id.*) She was noted as having "symptoms of a major depressive episode." (*Id.*) A physical exam revealed that Ms. Schartiger was "oriented to time, place, person, and situation," had a normal affect, and was "not

anxious, has normal attention span and concentration, does not have pressured speech, and does not have suicidal ideation." (*Id.*) Her depression score on this date was 20. (*Id.*) Nurse Sheetz increased Ms. Schartiger's zoloft to 100 mg, and directed her to return to the clinic for a follow-up in two weeks. (*Id.*)

On October 15, 2009, during a monthly, routine diabetes follow-up at Shenandoah, Ms. Schartiger reported symptoms of depression. (R. 1566-67.) Nurse Sheetz conducted a physical exam and noted "[n]o unusual anxiety or evidence of depression." (R. 1567.) Ms. Schartiger's depression score was 21, and Nurse Sheetz increased Ms. Schartiger's zoloft dosage to 200 mg a day. (R. 1567-68.) Ms. Schartiger returned to Shenandoah for a depression follow-up on November 10, 2009. (R. 1563.) She stated that her symptoms were controlled with the zoloft, however she admitted "to feeling depressed with thoughts of death, denies suicidal thoughts...not participating in things that normally she would enjoy–having trouble sleeping, may sleep for days and other days may sleep very little." (*Id.*) Her depression score was 23, but a physical exam revealed "[n]o unusual anxiety or evidence of depression." (R. 1564.) On December 17, 2009, Ms. Schartiger reported continuing depression despite the increased zoloft. (R. 1554). She reported that it was "somewhat difficult to meet home, work, or social obligations" and that "[t]he symptoms are aggravated by conflict or stress." (*Id.*) She further reported "experiencing irritable mood, fatigue or loss of energy, feelings of guilt or worthlessness, poor concentration and indecisiveness." (*Id.*) Nurse Sheetz referred her to behavioral health services. (R. 1556-67).

c. Shenandoah Valley Medical Systems Behavioral Health Services

On January 14, 2010, Licensed Clinical Social Worker Andrew Laurenson conducted an initial mental health evaluation of Ms. Schartiger at Shenandoah Valley Medical Systems Behavioral

Health Services. (R 1273-82.) Mr. Laurenson noted that Ms. Schartiger had been referred by to him by Nurse Sheetz because Ms. Shartiger's primary care providers (Nurse Sheetz and Dr. Jones) had been unable to control her depression with 200 mg of zoloft daily. (R. 1273.) Ms. Schartiger reported that she was a high-school graduate and that she had no problems or difficulties in school. She also stated that her professional goal was to become employed in a clerical office job. (R. 1276.) Ms. Schartiger listed her symptoms as weight loss, hopelessness, frequent hand washing, helplessness, lethargy, decreased libido, racing thoughts, worthlessness, guilt, chest pain, appetite disturbance, sleep disturbance, crying, and hyperventilation. (R. 1280.)

Mr. Laurenson listed Ms. Schartiger's strengths as "bright, articulate" and noted no apparent "limitations for learning." (R. 1277.) He also noted Ms. Schartiger's interests as "reading–history, mystery" and "word puzzles." (*Id*.) A mental status exam revealed that Ms. Schartiger was alert, neat, clean, casual, friendly, and cooperative. (R. 1279.) In addition, she maintained good eye-contact, had a full range of affect, and displayed a logical thought process. (*Id.*) Mr. Laurenson noted that Ms. Schartiger's mood was irritable. (*Id.*) Mr. Laurenson also conducted a cognitive evaluation. He noted a cognitive exam score of 30 out of 30, but also stated that Ms. Schartiger was "memory deficient" with poor concentration, fair judgment, good insight, and good general fund of information. (R. 1275, 1280.) Based on this initial evaluation, Mr. Laurenson diagnosed Ms. Schartiger with bipolar disorder/depression, post-traumatic stress syndrome, anxiety disorder, and obsessive-compulsive disorder. (R. 1240, 1281.) He also rated her current Global Assessment of Functioning as 55. (R. 1281) Mr. Laurenson recommended weekly psychotherapy sessions and referred Ms. Schartiger to Dr. Joseph Jurand for monthly psycho-pharmaceutical evaluation and management sessions. (R. 1271, 1281.)

On January 27, 2010, Ms. Schartiger started attended monthly sessions with Dr. Jurand. (R.1262-72, 1596-1601, 1619-1626). During her first visit, she reported feeling down and depressed and easily frustrated and agitated. (R. 1272). Dr. Jurand prescribed topamax in addition to continuing Ms. Schartiger on zoloft. (*Id.*) On February 23, 2010, Ms. Schartiger stated that she could sleep twenty-four hours a day. (R. 1270). Dr. Jurand increased Ms. Schartiger's topamax dosage and lowered her zoloft dosage from 200 mg to 100 mg a day. (*Id.*) Ms. Schartiger's condition remained generally unchanged during her March, April, and May sessions with Dr. Jurand. (R. 1264-65, 1268). On July 29, 2010, Dr. Jurand noted that Ms. Schartiger was losing weight and exercising regularly, but she that still experienced depression. (R. 1262.) On September 1, 2010, Dr. Jurand noted that Ms. Schartiger was "irritable–but always looks great here." He also increased her topamx dosage. (R. 1600.) On October 1, 2010, Ms. Schartiger reported more weight loss, but complained of poor concentration and periodic episodes of confusion. (R. 1599.) On November 16, 2010, Ms. Schartiger reported that her concentration was still poor and that she had problems with focusing. (R. 1598.) Dr. Jurand noted that Ms. Schartiger might have attention deficit disorder and prescribed strattera. (R. 1598.)

On January 13, 2011, Ms. Schartiger reported that her moods were stable and that "everything's alright." (R. 1596.) She noted that she was back at Gold's Gym and that she was babysitting nine children altogether. On March 24, 2011, Ms. Schartiger reported that she was sleeping the majority of the day and night. (R. 1348.) She also reported that she stopped her babysitting business a month ago and that "it feels like the world's closing in." (*Id.*) Dr. Jurand noted that Ms. Schartiger had not attended counseling since August and recommended she discontinue topamax by tapering the dose. (*Id.*) On April 12, 2011, Ms. Schartiger reported a slightly improved

mood. (R. 1347.) Dr. Jurand recommended that she resume taking strattera and continue with zoloft. (*Id.*) On May 6, 2011, Ms. Schartiger reported that she was feeling better with increased mood and energy. (R. 1626.) She reported that she was not sleeping as much as before and that her concentration was improved. (R. 1626.) On June 30, 2011, Ms. Schartiger told Dr. Jurand that the medicines were working and that she was exercising. (R. 1625.) On August 5, 2011, Ms. Schartiger reported that "everything is looking good." (R. 1624.) She stated that she was feeling a lot better, was getting out more and helping others, and was trying to get pregnant. (*Id.*) Dr. Jurand discontinued topamax and lowered the zoloft dosage in order to wean Ms. Schartiger off of the zoloft. (*Id.*) On September 1, 2011, Ms. Schartiger reported that she was no longer taking topamax and that she was "doing really good." (R. 1623.) She further stated that she "feels better now than in a long time" and that she does not get mad as easily. (*Id.*) Ms. Schartiger advised Dr. Jurand that she was no longer seeing a therapist and that she "has been more active, even at home." (*Id.*) She also reported that she was eating better, exercising for approximately one hour a day, and was "back to doing crafts, keeping busy doing good things." (*Id.*) Dr. Jurand recommended that she continue to wean off the medications. (*Id.*)

On October 4, 2011, Ms. Schartiger reported that she tried to stop using zoloft, but that she experienced mood swings as a result. She also stated that she was still trying to get pregnant. (R. 1622). Dr. Jurand continued her on zoloft and strattera. (*Id.*) On December 2, 2011, Dr. Jurand noted that Ms. Schartiger's focus and attention were excellent. (R. 1621.) On February 28, 2012, Ms. Schartiger reported that she was handling her anger well and that her concentration was improved. She also stated that "straterra is the wonder drug." (R. 1620.) Ms. Schartiger's last reported visit to Dr. Jurand was on May 21, 2012. (R. 1619.) She reported that she was no longer taking zoloft and

that she was easily frustrated and not sleeping more than a few hours a night. (*Id*.)

d. Medical Opinions Relating to Mental Impairment

Randolph R. MacDonald, ED.D., performed a consultative mental status examination of Ms. Schartiger on November 24, 2008. (R. 1138-40.) During the clinical interview, Ms. Schartiger reported that she "has a lot of difficulty with sleep" and that her appetite was disturbed. (R. 1139.) She also stated that she is claustrophobic, that she has experienced significant weight gain over the last six months, and that she experiences crying episodes. (*Id*.) She indicated that her energy level is very low, that her mood over the last few weeks was depressed, and that she experiences panic attacks. (*Id*.) Dr. MacDonald noted "no evidence of hallucinations or delusions, and she denied any suicidal or homicidal thoughts at this time." (*Id*.) Ms. Schartiger's speech was normal in pace, tone, and volume, and her mood was depressed. Dr. MacDonald also noted that Ms. Schartiger's affect was "somewhat restricted," but that her "thought content was clear." (*Id*.) Ms. Schartiger estimated her cognitive capacity to be average, and Dr. MacDonald stated that her insight, judgment, and immediate and recent memory were "good." (*Id*.) Ms. Schartiger "remembered four words immediately after having them read to her...[and] she remembered those same four words about 20 minutes after they were first read." (*Id*.) However, Dr. MacDonald noted that her concentration was poor because she "attempted serial threes, but with little success." (R. 1140.) Based on the exam and interview, Dr. MacDonald assessed Ms. Schartiger as having "adjustment disorder with depression" with a fair prognosis. (*Id*.) He also noted that her capability was "good...she handles her own finances at this time." (*Id*.)

On June 12, 2009, Psychologist Harold Slaughter conducted a psychological evaluation of Ms. Schartiger. (R. 1229-33.) Dr. Slaughter noted that Ms. Schartiger arrived for her appointment

with her boyfriend's ten month-old and nine year-old sons.[5] (R. 1229.) Dr. Slaughter concluded that "[s]he apparently saw no problem in coming to the evaluation with the two children by herself." (*Id*.) During the evaluation, Ms. Schartiger reported serious depression beginning in 2006. (R. 1230.) She stated she was first prescribed lexapro at this time, but that now she is on zoloft. (*Id*.) She reported no history of counseling, treatment by a psychiatrist, or psychiatric hospitalizations. (*Id*.) Ms. Schartiger reported "a generalized depressed mood, increased irritability, and symptoms consistent with Posttraumatic Stress Disorder." (*Id*.) She also reported generalized paranoia, difficulty in falling asleep, and difficulty concentrating. (*Id*.) Ms. Schartiger also told Dr. Slaughter that she graduated from high school and that she was in regular classes. (*Id*.)

A mental status examination revealed Ms. Schartiger to be "very cooperative, speech was without impediment, and she was oriented to all spheres." (R. 1231.) Her mood was appropriate and her affect was broad. (*Id*.) Dr. Slaughter noted that her "[t]hought process was within normal limits, thought content was coherent and relevant to topic, and there were no indications of serious emotional issues (psychosis) such as thought disorder, hallucinations, delusions, etc." (*Id*.) Ms. Schartiger's immediate and remote memory was within normal limits, but Dr. Slaughter noted her recent memory as moderately deficient. (*Id*.) Additionally, her concentration and judgement were average, her persistence was within normal limits, her pace was slow and steady, and her social functioning during the evaluation was within normal limits. (*Id*.)

An IQ test revealed a verbal score of 87, a performance score of 70, and a full scale score of 77. (R. 1231.) Achievement testing showed that Ms. Schartiger performed at a 5th grade level in

---

[5]Although Dr. Slaughter identified the two children as Ms. Schartiger's boyfriend's children, it appears from the record that Ms. Schartiger's boyfriend actually only has one son, who was nine years old at the time of Dr. Slaughter's examination. Ms. Schartiger was babysitting the ten month-old child for a friend. (R. 23.)

reading, a 9th grade level in spelling, and a 7th grade level in math computation. (R. 1232.) The Beck Depression Inventory yielded a raw score of 45, "placing her within the severe level of depression." (*Id.*) Based on this evaluation, Dr. Slaughter diagnosed Ms. Schartiger with posttraumatic stress disorder, major depressive disorder, and borderline intellectual functioning. Dr. Slaughter explained that the borderline functioning diagnoses "is based on today's WAIS-III Full Scale IQ of 77." (*Id.*) Dr. Slaughter further opined that "[i]t is my opinion that there are unresolved issues...which could be addressed through counseling. Additionally, I believe that the counseling would be helpful, in addition to her current medication, in addressing her multiple symptoms of depression." (*Id.*)

On March 7, 2011, Dr. McDonald conducted a second mental status examination and clinical interview of Ms. Schartiger. (R. 1602-04.) During the interview, Ms. Schartiger reported that she sometimes goes a few days without sleep and other times she does not get out of bed for three days. (R. 1603.) She stated that she has no appetite, and that she has lost sixty pounds in the last six months. (*Id.*) She also reported experiencing crying episodes, low energy levels, and a depressed mood. (*Id.*) She also stated that she is claustrophobic and that she experiences panic attacks. (*Id.*) A mental status examination revealed that Ms. Schartiger

> was oriented to all spheres. There was no evidence of hallucination or delusion and she denied any suicidal or homicidal thoughts. Her affect was somewhat restricted. Her thought content was clear. Cognitive capability was probably average. Her insight seemed good. Her judgment was good within normal limits. Her immediate memory was good. She remembered four words immediately after having them read to her. Her recent memory was good. She remembered those same four words after about seven or eight minutes. Her remote memory was fair. She said there are lots of gaps in her personal history. Her concentration was poor. She could not do serial 3's and her Digit Span was deficient.

(R.1603.) Dr. MacDonald diagnosed Ms. Schartiger with bipolar disorder, panic disorder, and

obsessive compulsive disorder. (R. 1604.) He also reported that her prognosis was "fair with treatment" and that her capability was good. (*Id.*)

e. Mental RFC Assessments

On December 2, 2008, state agency psychological consultant Bob Marinelli, ED.D. prepared a psychiatric review technique and a mental RFC assessment. (R. 1141-58.) Based on a review of Ms. Schartiger's records, Dr. Marinelli found that she had mild limitations in activities of daily living, mild limitations in social functioning, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation. (R. 1155.) Dr. Marinelli assessed Ms. Schartiger as having a mental RFC "reduced by moderate limitations in concentration & sustained persistence. She has the capacity for routine competitive employment involving short & simple instructions with low pressure demands." (R. 1143.)

On March 16, 2011, state agency psychological consultant G. David Allen, Ph.D. prepared a psychiatric review technique. (R. 2081-94.) Dr. Allen found that Ms. Schartiger's mental impairments were not severe. (R. 2081.) Additionally, he found only mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (R. 2091.) After a review of the medical evidence, Dr. Allen opined as follows:

> Treating source MER given controlling weight. TS diagnoses Bipolar depressed only. Last progress note indicates claimant saying "everything's all right." Says claimant back to Gold's Gym and baby-sitting nine children. Given this report, the statements as to severity of dysfunction on afrq seem partially credible only. Reviewed ALJ decision and findings of moderation limitation for social and concentration. Based on evidence available to ALJ, conclusions seem reasonable. Differences with ALJ compared to present assessment have to do with the recent treating source report of function as "OK" across multiple descriptors.

(R. 2093.)

**D. Testimonial Evidence**

Testimony was taken at the hearings held on May 24, 2010, and August 3, 2012. The following portions of the testimony are relevant to the disposition of the case:

*1. May 24, 2010 Hearing*

Ms. Schartiger testified that she last worked as a finisher at Quad Graphics and that she hurt her back permanently while pulling skids of magazines. (R. 42.) When asked how she was treated for the lumbar sprain, she testified "I went through the chiropractic care, through medication, I am still going through chiropractic care and I am on Celebrex for the back pain and the lupus. And every three months, they are giving me Prednisone." (R. 50.) Ms. Schartiger also testified that she had been diagnosed with rheumatoid arthritis and lupus by Dr. Rezaian. (R. 51.)

Regarding previous employment, Ms. Schartiger testified that she worked as grocery store clerk from the age of 15 until her senior year of high school. (R. 52.) She also worked at a sweater factory for approximately two years and then as a telemarketer for two months. (R. 53-54.) Next, she worked as a tour guide for five years. (R. 54.) Ms. Schartiger also stated that she sometimes volunteers at her fiance's son's school, but that she cannot be there long because she cannot handle being around the kids. (*Id.*) She testified that she will only stay at the school for about an hour. (*Id.*)

As to her lifestyle and daily activities, Ms. Schartiger testified that she is not married and has no children. (R. 56.) She stated that she lives in a trailer and that sometimes her fiancé comes over and stays with her when he gets off work. (*Id.*) She also testified that she can only drive in "little small areas" because she cannot "handle driving in cities." (*Id.*) She stated that driving in too much traffic gives her claustrophobia. (R. 57.)

Ms. Schartiger stated that she has difficulty using her hands because they go numb. (R. 55.) She testified that she cannot write without her hands going numb. (*Id*.) She also stated that her legs and feet go numb. (R. 56.) When asked if the numbness was caused by her diabetes, Ms. Schartiger replied that her doctors told her that it was unrelated to diabetes. (*Id*.) When asked about the heaviest weight that she thinks she can lift, Ms. Schartiger testified that she can lift "maybe five to eight pounds." (R. 57.) She indicated that she can lift groceries and do her own grocery shopping only if someone else takes her. (R. 57.) Ms. Schartiger stated that she cooks and sometimes she can clean, but that her fiance does the mopping. (R. 58.) She can put the laundry in the washer and dryer, but her fiance has to carry the laundry outside so that she can hang the clothes. (*Id*.)

Regarding social activities, Ms. Schartiger testified that she goes to church "when I can get there. It depends on how I'm functioning that morning." (R. 58.) She estimated that she attends church two to three times a month. (*Id*.) Ms. Schartiger testified that her hobbies include reading, playing board games, and scrapbooking. (R. 59.) She indicated that she used to like gardening, but that she can no longer garden because the bending and stooping hurt her back too much. (*Id*.) When asked if she has any difficulty reading, Ms. Schartiger replied "sometimes I can't concentrate or focus like on the paper or whatever." (R. 60.)

The ALJ asked Ms. Schartiger to describe her activities on the previous day. Ms. Schartiger testified that she woke up at 8:30 and went to church with her fiance's son. (R. 60.) After church, she and her finance's son, made meatloaf, mashed potatoes, gravy, and green beans. (R. 60-61.) She then helped her fiance's son with his science project and helped him get on the computer to play computer games. (R 61.) After that, she did laundry. (*Id*.)

*2. August 3, 2012 Hearing*

Ms. Schartiger testified that her condition had deteriorated since the last hearing. (R. 15-16.) She stated that she is more fatigued and has more pain. (R. 16.) Ms. Schartiger also testified that she was now married and that her husband lives with her in her trailer. (R. 17.) She stated that she no longer volunteers at her step-son's school because she hurts too much and gets tired. (R. 20.)

Regarding exercise, Ms. Schartiger testified that she walks around her yard twice a week. (R. 20.) She also testified that she was exercising more in the past but that she "got worse where I can't hardly–I mean, I can't move. I get tired, I'm fatigued all the time and I'm in pain." (R. 20-21.) She stated that she stopped exercising and gained back the weight she had lost in September of 2011 because that is when her lupus started getting worse. (R. 21.) She also indicated that she started falling in September of 2011. (*Id.*) When asked what occurs when she falls, Ms. Schartiger explained that she "can't really move where everything is just like my back and things like that." (R. 22.) She testified that she has never broken any bones due to her falls. (*Id.*)

Ms. Schartiger testified that she still had back pain, which she was treating with Celebrex, Lyrica, and Plaquenil. (R. 22.) She also stated that she took Strattera for her depression. (R. 22-23.) Regarding her carpal tunnel syndrome, Ms. Schartiger testified that the surgery improved her condition "for a little while, but it's back." (R. 24.) When asked how she was currently treating the carpal tunnel syndrome, Ms. Schartiger testified that she wears braces on both hands at night. (R. 24-25.) However, she also stated that the braces do not improve her condition and that she only wears them because the doctor told her to wear them. (R. 25.)

The ALJ questioned Ms. Schartiger about the ten-month-old child that she brought to her consultation appointment with Dr. Slaughter. (R. 23.) Ms. Schartiger testified that she was caring for a friend's child at the time "because she needed somebody to watch him." (R. 23-24.) She stated

that she watched the child for about a year and a half, but that she stopped babysitting him in March of 2011. (R. 24.) She testified that she stopped caring for the child because she could no longer watch him. (*Id.*)

Ms. Schartiger also testified that she received unemployment benefits for six to eight months during 2008. (R. 26.) She stated that she was required to look for employment during that time and that she reapplied for the Division of Tourism where she used to work. (*Id.*) When asked if she believed she could perform that job in 2008, she stated that she believed she could "in a way...I hurt and things like that, standing and every–but I needed a job." (*Id.*) She also indicated that she looked for a job three times per week, both outside the home and by applying online. (R. 26-27.)

Regarding activities outside the home, Ms. Schartiger testified that she stopped volunteering at her step-son's school in the fall of 2010 and that she only attends church about once a month. (R. 27.) She also testified that she no longer helps her step-son with his homework. (*Id.*)

Vocational Expert Arthur Brown also testified at the second hearing. The ALJ posed the following hypothetical to Mr. Brown:

> Please assume that she is limited to a light exertional capacity. She can do occasional postural activities, she should never climb ladders, ropes or scaffolds. She must avoid even moderate exposure to workplace hazards. And extreme temperatures. In addition, she can perform frequent reaching, handling and fingering.

(R. 29.) The ALJ then asked if this hypothetical person could perform any of Ms. Schartiger's past work. (*Id.*) Mr. Brown stated that she could not perform the Quad Graphics job, but that she could perform her past work of grocery store cashier, travel clerk, and hand sewer. (R. 30-31.) He also testified that she could perform the job of telemarketer. (R. 31.)

The ALJ then asked Mr. Brown to consider the first hypothetical, but "assume that the claimant is limited to lifting and carrying ten pounds occasionally, and less than ten pounds frequently. Would that change your testimony?" (R. 31.) Mr. Brown testified that she could still do the tour clerk and telemarketing job, but not the cashier or sweater sewing job. (*Id.*) Next, the ALJ asked Mr. Brown to assume that the hypothetical person is limited to a sedentary exertional capacity. (R. 32.) Mr. Brown testified that she could still perform the telemarketer position. (*Id.*) He also testified that such a person could also perform the job of telephone clerk and document preparer and that both jobs exist in the local and national economies. (R. 33.) Finally, the ALJ asked Mr. Brown to consider a hypothetical person with all of the above limitations, with the additional limitation on maintaining concentration, persistence, and pace for 75% of the workday due to pain and fatigue. (R. 34.) Mr. Brown replied that "[s]he would be able to maintain the demands of competitive work, based on your hypothetical." (R. 34.)[6]

### III. ALJ FINDINGS

In determining whether Ms. Schartiger was disabled, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. At step one, the ALJ found that Ms. Schartiger had not engaged in substantial gainful activity since October 15, 2007, the alleged onset date of disability. At step two, the ALJ found that she had the following severe impairments: degenerative disc disease of the lumbosacral spine; sero-negative arthritis; fibromyalgia; lupus; carpal tunnel syndrome on the dominant right hand; diabetes mellitus; and morbid obesity. Additionally, the ALJ specifically found that Ms. Schartiger's depression was not severe. At the

---

[6]The undersigned notes that the transcript appears to contain a typographical error in this regard. It is likely that Mr. Brown actually testified that she would be *unable* to maintain the demands of competitive work based on the third hypothetical. However, because the ALJ did not ultimately include any limitations on concentration, persistence, or pace in the RFC determination, this error is insignificant.

third step, the ALJ found that none of Ms. Schartiger's impairments meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In order to consider step four of the process, the ALJ determined that Ms. Schartiger now has the following RFC:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can frequently perform reaching, handling, and fingering. She can occasionally climb ramps or stairs (never ladders, ropes, or scaffolds), balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to workplace hazards and extreme temperatures.

In step four, the ALJ found that Ms. Schartiger had past relevant work as a cashier, assistant manager, hand sewer, travel clerk, and telemarketer. The ALJ compared Ms. Schartiger's RFC with the physical and mental demands of this past relevant work and found that she was able to perform her past relevant work of telemarketer as actually and generally performed. Although such a finding at step four warrants a finding of "not disabled," the ALJ also made an alternative finding in step five that based on Ms. Schartiger's age, education, work experience, and RFC, she is cable of making an adjustment to work that exists in significant numbers in the national economy. Accordingly, the ALJ found that Ms. Schartiger was not disabled.

## IV.  THE MOTIONS FOR SUMMARY JUDGMENT

### A. Contentions of the Parties

Ms. Schartiger contends that the ALJ's decision is not supported by substantial evidence and is erroneous as a matter of law. Specifically, she argues that (1) the ALJ's finding that her mental impairments were not severe was not supported by substantial evidence; (2) the ALJ failed to properly evaluate all of the medical evidence in assessing her RFC; and (3) the ALJ's finding that she could perform past relevant work was erroneous.

## B. The Standards

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*2. Judicial Review*

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 664-65 (1988); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the Claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d

585, 589 (4th Cir. 2001)).  The ALJ's decision must be upheld if it is supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3).

## C. Discussion

*1. Whether Substantial Evidence Supports the ALJ's Finding that Schartiger Did Not Have a Severe Mental Impairment?*

Ms. Schartiger contends that the ALJ failed to consider the consultative evaluation report of Dr. Harold Slaughter, which diagnoses her with borderline intellectual functioning, in finding her mental impairments non-severe. Additionally, Ms. Schartiger argues that the ALJ did not consider or make specific findings regarding whether the combination of depression and borderline intellectual functioning constitutes a severe impairment. The Commissioner contends that the ALJ did consider Dr. Slaughter's report, but gave it little weight in favor of more recent, updated consultative findings. Additionally, the Commissioner asserts that the ALJ properly considered the record as a whole in determining that Ms. Schartiger's mental impairments do not significantly limit her ability to perform work activities.

At step two of the sequential evaluation process, the ALJ is required to determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. §  404.1520(c).  The claimant bears the burden of demonstrating the she has a medically severe impairment.  *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). A severe impairment is "one which impacts more than minimally on an individual's functional ability to perform basic work activities." *Evans v. Heckler*, 734 F.2d 1012 (4th Cir. 1984). An impairment or combination of impairments is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). Basic

work activities are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). In order to properly evaluate the severity of mental impairments, the ALJ must consider the factors contained in section 12.00 of the Listing of Impairments in Appendix 1. The factors contained in section 12.00 are separated into four broad functional areas in which the Commissioner rates the degree of claimant's functional limitations, specifically, 1) activities of daily living; 2) social functioning; 3) concentration, persistence or pace; and 4) episodes of decompensation. 20 C.F.R. § 404.1520(a).

Here, the ALJ found that Ms. Schartiger's "medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (R. 105.) The ALJ then proceeded to analyze in detail each of the four functional areas as required by 20 C.F.R. § 404.1520(a) and found that Ms. Schartiger had at most only mild limitations due to her mental impairments. Additionally, the ALJ acknowledged that she found Ms. Schartiger's mental impairments to be severe in her first hearing decision and gave specific reasons for the different finding in her second hearing decision. The ALJ noted that "the record as a whole including additional testimony at the remand hearing showed that the claimant had significantly greater mental capacity during the relevant time period." (R. 106.)

Moreover, contrary to Ms. Schartiger's contention, the ALJ specifically considered Dr. Slaughter's consultative report in reaching her decision that Ms. Schartiger's mental impairments are nonsevere. The ALJ noted that, based on the record as a whole, including updated medical evidence and testimony, "the opinions provided by the State agency psychological consultant in the original application (that the claimant's mental impairment is mildly severe) is given only partial weight." (R. 106.) It is clear to the undersigned that the ALJ was referring to Dr. Slaughter's opinion

because he was the only State agency psychological consultant to opine that Ms. Schartiger's mental impairments were mildly severe. Additionally, the ALJ discussed her reasons for discounting Dr. Slaughter's diagnosis of borderline intellectual functioning in the first hearing decision, and those findings are incorporated into the ALJ's second hearing decision. (R. 78, 101.) Specifically, the ALJ explained that "[w]hile Dr. Slaugher [sic] diagnosed her with borderline intellectual functioning, her IQ scores were relatively high with a verbal IQ of 87 and a full scale IQ of 77. Additionally, she had held jobs as a telemarketer and tour guide and graduated high school, with no evidence of attending any special education classes. Therefore, Dr. Slaughter's opinion that she had borderline intellectual functioning is given little weight." (R. 78.) Accordingly, the ALJ's determination that Ms. Schartiger's depression was non-severe is supported by substantial evidence.

Finally, Ms. Schartiger's argument that the ALJ's determination that her mental impairments were non-severe "fails to be supported by substantial evidence" because the ALJ did not consider the combination of depression and borderline intellectual functioning lacks merit. Ms. Schartiger correctly points out that "[w]here a claimant has alleged a multitude of impairments, a claim for Social Security Disability Benefits may lie even though none of the impairments, considered individually, is disabling, and in such instance it is the duty of the Administrative Law Judge to make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments caused the claimant to be disabled." However, Ms. Schartiger incorrectly argues that this consideration of the combination of impairments must come at step two of process. This Court has repeatedly held that where the ALJ finds that the claimant has at least one severe impairment at step two of the process, a failure to designate another impairment as severe is not reversible error as long as the ALJ considers the combined effect of all of the

claimant's impairments at later steps in the analysis. *See e.g., Lauver v. Astrue*, No. 2:08-cv-87, 2010 WL 1404767 at *4 (N.D.W.V. March 31, 2010) ("If it is not reversible error for an ALJ to fail to list all of a claimant's severe impairments at step two of the sequential evaluation process, so long as all of said impairments and the limitations imposed by them are considered in formulating the RFC, then it follows that it is not reversible error for the ALJ to mischaracterize the severity of a claimant's impairment at step two of the sequential evaluation process, so long as all of the limitations posed by the actual impairment are considered in formulating the RFC."); *Mauzy v. Astrue*, No. 2:08-cv-75, 2010 WL 1369107 at *6 (N.D.W.V. March 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments.").

Here, the ALJ found several severe impairments at step two and proceeded with the evaluation process. Contrary to Ms. Schartiger's assertion that the ALJ "completely omitted from her residual functional capacity assessment any consideration of the Plaintiff's borderline functioning or psychological impairments," the ALJ specifically considered Ms. Schartiger's alleged mental impairments in crafting the RFC. The ALJ considered whether Ms. Schartiger was limited in concentration, persistence, or pace and specifically found "no evidence of any limitation in ability to sustain an ordinary routine without special supervision." (R. 105.) The ALJ further noted that "[m]ental status examinations revealed normal thought content, good recent and immediate memory, average cognitive ability, no evidence of hallucinations or delusions, and normal psychomotor behavior." (*Id*.) Additionally, as noted above, the ALJ expressly rejected Dr. Slaughter's diagnosis of borderline intellectual functioning. Moreover, in addressing the opinion evidence, the ALJ noted

that the "State psychological findings are generally consistent with the record evidence, though I found less limitations in concentration based on newer evidence and the claimant's testimony." Thus, contrary to Ms. Schartiger's contentions, the ALJ did make "specific and well articulated" findings with respect to Ms. Schartiger's mental impairments, despite finding them non-severe at step two. Further, a review of the ALJ's decisions shows that these findings were clearly based on substantial evidence.

*2. Whether the ALJ Erred in Assessing Schartiger's RFC?*

Ms. Schartiger next argues that the ALJ failed to properly determine her RFC because she did not evaluate pertinent medical evidence and improperly evaluated opinion evidence. The Commissioner asserts that substantial evidence supports the ALJ's RFC determination.

A Residual Functional Capacity is what Claimant can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. *Id.* It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. *Id.* Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. *Id.* These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. *Id.* This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. *Id.* The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946.

Here, the ALJ determined Ms. Schartiger to have the following RFC:

to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can frequently perform reaching, handling, and fingering. She can occasionally climb ramps or stairs (never ladders, ropes, or scaffolds), balance, stoop, kneel, crouch, and crawl. She must avoid even moderate exposure to workplace hazards and extreme temperatures.

Ms. Schartiger raises three arguments regarding this RFC. The Court will consider each in turn.

a. The ALJ's Consideration of Pertinent Medical Evidence

First, Ms. Schartiger argues that the ALJ "failed to evaluate pertinent evidence regarding [her] need for a hand held assistive device, and of her multiple hand impairments" in determining her RFC. Specifically, she contends that the ALJ ignored evidence regarding her complaints of imbalance and frequent falls in August and September of 2010 and that the ALJ failed to mention that her treating neurologist prescribed her with a three-wheeled walker in September of 2010. Ms. Schartiger also contends that the ALJ failed to consider evidence of limitations on her ability to handle and finger objects and reach in all directions due to the combination of her carpal tunnel syndrome and sero-negative arthritis.

A review of the ALJ's decision reveals that the ALJ did discuss these impairments at length and found that "objective records show no evidence of debilitating functional limitations." The ALJ then supported this conclusion with four pages of evidence from the medical records. For example, the ALJ specifically noted that Ms. Schartiger "testified and told some of her doctors that she suffers from frequent falls and therefore cannot exercise," but, just three months later, Ms. Schartiger reported to Dr. Jurand that she was "back at Gold's Gym," "babysitting 9 kids altogether," and "getting a newborn in May." Additionally, the ALJ noted that Ms. Schartiger complained of general numbness and imbalance to her neurologist on September 20, 2010, which is the date that she was prescribed the walker, but that a musculoskeletal examination conducted on that date revealed no

joint pain, swelling, muscular weakness, back pain, or neck pain. The ALJ also noted that Dr. Monderewicz expressly stated that Ms. Schartiger did not require an assistive device during her consultative examination in November of 2008. The ALJ also stated that "the record shows the claimant cared for two children (including a child who was not her own) for extended periods of time, volunteered at school, and applied for jobs to continue receiving unemployment benefits." Additionally, the ALJ noted that as of September of 2011, she was trying to get pregnant and reported that she was "more active even at home, eating better, exercising (walking) daily for approx. 1 hr. [and] doing crafts." The ALJ also expressly discussed Ms. Schartiger's carpal tunnel syndrome and noted that medical records showed vast improvement after her right wrist surgery.

Most notably, the ALJ expressly gave Ms. Schartiger "the benefit of the doubt in finding some greater limitations" in the RFC. (R. 111.) For example, although Dr. Monderewicz and all three of the state agency medical consultants concluded that Ms. Schartiger had no limitations in handling and fingering objects, the ALJ included these manipulative limitations in Ms. Schartiger's RFC. Moreover, even though all four physical RFC assessments indicated that Ms. Schartiger had the exertional capacity to perform light work, the ALJ concluded that Ms. Schartiger could only perform sedentary work, which by definition requires only occasional walking and standing. 20 CFR § 404.1567(a). Thus, contrary to Ms. Schartiger's contention, the ALJ not only considered pertinent evidence relating to her leg and hand impairments, the ALJ clearly took this evidence into account in crafting the RFC.

b. The ALJ's Evaluation of Dr. Monderwicz's Opinion on Remand

Second, Ms. Schartiger contends that the ALJ failed to properly evaluate the medical opinion of consultative examiner Dr. Monderwicz in accordance with the Appeals Council's

mandate. In the ALJ's first hearing decision, issued June 25, 2010, the ALJ discussed Dr. Monderwicz's opinion evidence, but accorded it "little weight because her opinion was based on the claimant's report of rheumatoid arthritis and lupus, which is not supported by the record evidence." (R. 77.) The Appeals Council remanded the case to the ALJ, in part, because the decision did not contain an adequate evaluation of Dr. Monderwicz's opinion. (R. 89.) In remanding the case to the ALJ, the Appeals Council noted "[t]he hearing decision does not contain an adequate evaluation of the nontreating source opinion in Exhibit 23F" because "Dr. Monderwicz provided objective findings to support her opinion that the claimant was limited in her ability to perform prolonged sitting and standing, as well as walking, bending, squatting, kneeling, crawling, lifting and carrying."

On remand, "[t]he administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b). Here, the ALJ again considered Dr. Monderwicz's opinion, and again gave it little weight "because it is based on the claimant's report of rheumatoid arthritis and lupus. These impairments, at the time, were not supported by the record evidence. Moreover, Dr. Monderewicz's findings do not quantifiably assess the extent of the claimant's limitations." Ms. Schartiger contends that this analysis is erroneous because "the Appeals Council specifically rejected the Administrative Law Judge's rationale for rejecting the opinions of Dr. Monderwicz" and the ALJ "again rejected Dr. Monderewicz's opinions on the identical basis as in her first decision."

However, Ms. Schartiger overstates the effect of the Appeals Council decision. The Appeals Council did not order the ALJ to give Dr. Monderwicz's opinion more weight. Nor did it reject the ALJ's reasoning for assigning the opinion little weight. Rather, the Appeals Council ordered the ALJ

to: "[o]btain additional evidence concerning the claimant's impairments in order to complete the administrative record...[f]urther evaluate the claimant's subjective complaints...consider[ing] the new evidence that was submitted with the request for review...[g]ive further consideration to the claimant's maximum residual functional capacity...and provide rationale with specific references to evidence of record in support of the assessed limitations...by evaulat[ing] the nontreating source opinion pursuant to the provisions of 20 CFR 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-5p, and explain the weight given to such opinion evidence." (R. 90.)

Here, the ALJ obtained several hundred pages of additional medical evidence, including two new physical RFC assessments. The ALJ described in detail how this new medical evidence supported the new RFC determination and how this new evidence is inconsistent with Dr. Monderwicz's medical opinion. For example, the ALJ notes that a musculoskeletal examination in August of 2011 "revealed 5/5 muscle strength and normal gait." (R. 109.) In January of 2011 "she was 'back at Gold's gym' and 'babysitting 9 kids altogether'." (R. 110). Finally, the ALJ stated that she "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p...[and] 96-5p." (R. 107.) Thus, the ALJ fully complied with the mandate of the Appeals Council by more thoroughly evaluating the record evidence, including opinion evidence, in making an RFC determination.

Moreover, while the ALJ ultimately gave Dr. Monderwicz's opinion little weight for some of the same reasons as in the first hearing decision, the ALJ also noted that Dr. Monderwicz's opinion did not quantifiably describe the functional limitations. For example, Dr. Monderwicz opined that "[p]rolonged sitting and standing, as well as walking, bending, squatting, kneeling, crawling, lifting, and carrying are limited," but there is no indication as to how many hours in a

workday Ms. Schartiger can perform these tasks. Similarly, Dr. Monderwicz stated that "[u]se of the upper extremities for reaching, pushing, pulling, and overhead use is limited," but, again, there is no explanation of the extent to which Ms. Schartiger is limited in these activities. Thus, the ALJ did not merely "reject" the opinion for identical reasons; rather, the ALJ clearly complied with the Appeals Council's instructions and properly evaluated and weighed Dr. Monderwicz's opinion.[7]

c. The ALJ's Consideration of a Treating Source Opinion

Finally, Ms. Schartiger contends that the ALJ erred as a matter of law in evaluating the medical opinion of her treating rheumatologist Dr. Rezaian. On June 26, 2012, Dr. Rezaian completed a Medical Questionnaire regarding Ms. Schartiger's physical capacities. In her decision, the ALJ evaluated Dr. Rezaian's opinion as follows:

> I give little weight to the opinion of Michael M. Rezaian, M.D., the claimant's treating rheumatologist, who opined in June 2012 that the claimant is limited to 2 hours of sitting, 1 hour of standing and walking, and no bending, stooping, crawling, climbing, crouching, or kneeling. Dr. Rezaian added that the claimant could occasionally lift up to 10 pounds and frequently balance and reach, but never push or pull with her feet. Dr. Rezaian's opinion is based on his diagnostic "impressions" of lupus, fibromyalgia, and sero-negative arthritis. It is not clear from the record how he arrived at these diagnostic impressions. His findings are not supported by the record evidence as a whole discussed herein.

(R. 112.) Ms. Schartiger contends that the ALJ failed to evaluate whether Dr. Rezaian's opinion should be given controlling weight in accordance with the factors laid out in SSR 96-2p. In addition, she contends that apart from the controlling weight analysis, the ALJ failed to properly apply the required criteria for weighing medical opinions in deciding to reject Dr. Rezaina's opinion.

[7]Ms. Schartiger does not contend that the ALJ's decision to give Dr. Monderwicz's opinion little weight is unsupported by substantial evidence, merely that the ALJ failed to evaluate the opinion in the manner directed by the Appeals Council. However, a review of the ALJ's decisions clearly shows that it is well-supported by the record evidence because Dr. Monderwicz's opinion is inconsistent with much of the objective medical evidence. Additionally, the ALJ provides ample documentation of those inconsistencies. Thus, the decision to afford the opinion little weight is supported by substantial evidence.

A treating source medical opinion must be given controlling weight when all of the following are present: (1) the opinion comes from a treating source; (2) the opinion is about the nature and severity of the claimant's impairments; (3) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (4) the opinion is not inconsistent with other substantial evidence in the case record. SSR 96-2p; 20 C.F.R. §416.927(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996); *see also Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) ("Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.")

However, "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p Thus, if the ALJ determines that a treating source opinion is not entitled to controlling weight, the ALJ must then evaluate and weigh the opinion by applying the following factors: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist; and (6) any other factors which tend to support or contradict

the opinion. 20 C.F.R. § 404.1527(d)(2); 20 C.F.R. § 416.927(c). The ALJ must give good reasons for the weight given to a treating source's opinion. 20 C.F.R. § 416.927(c)(2). Specifically, the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

Ms. Schartiger's first contention regarding the ALJ's treatment of Dr. Rezaian's opinion is that the ALJ "failed to evaluate any of the actual opinions of Dr. Rezain, choosing instead to reject his opinions in total." The argument lacks merit. The ALJ clearly identifies that it is the June 2012 opinion of Dr. Rezaian to which she gives little weight. To the extent that Ms. Schartiger is asserting that every medical record from Dr. Rezaian is a medical opinion which must be evaluated and assigned weight, Ms. Schartiger is incorrect. "Under 20 CFR 404.1527(a) and 416.927(a), 'medical opinions' are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight." SSR 96-2p. Thus, the medical records which merely document Dr. Rezaian's treatment of Ms. Schartiger are not medical opinions to be weighed, rather they are part of the objective medical evidence to be considered by the ALJ in reaching a disability determination. Additionally, to the extent Ms. Schartiger is contending that the ALJ rejected these records from Dr. Rezaian, this too is incorrect. The ALJ discussed Dr. Rezaian's treatment records in detailed and clearly relied on them in making her decisions. (R. 108-10.)

Turning to the medical opinion issued by Dr. Rezaian in June of 2012, there are two issues before the Court: (1) whether the ALJ properly complied with the "treating source rule" in considering Dr. Rezaian's medical opinion and deciding not to give it controlling weight and (2)

whether the ALJ properly weighed Dr. Rezaian's in accordance with the factors set out in the regulations. Ms. Schartiger contends that the ALJ "failed to evaluate whether the opinions of Dr. Rezaian should be accorded controlling weight" because "she failed to consider whether these opinions were medical opinions, whether they came from a treating source, whether they [were] well-supported by medically acceptable clinical and laboratory diagnostic techniques, or whether they were inconsistent with the substantial evidence of record." Additionally, Ms. Schartiger argues that the ALJ's evaluation of Dr. Rezaian's opinion is erroneous as a matter of law because "there is no indication from the decision that the Administrative Law Judge considered **any** of [the 20 C.F.R. § 416.927(c)] factors in evaluating the opinions of Dr. Rezaian."

Before discussing and assigning weight to the medical opinions, the ALJ undertook a lengthy and detailed analysis of the record evidence. Throughout the analysis, the ALJ specifically noted Dr. Rezaian's ongoing and lengthy treatment relationship with Ms. Schartiger. She discussed Dr. Rezaian's diagnoses of sero-negative arthritis, systemic lupus, and arthralgias on June 1, 2010. She also referenced Dr. Rezaian's findings and recommendations throughout the decision. Additionally, the ALJ noted several instances where Dr. Rezaian's own treatment records contradict his 2012 medical opinion. For example, treatment records show that Dr. Rezaian "has recommended daily exercise to help the claimant avoid deconditioning and stiffness." In February of 2012, Dr. Rezaian noted stiffness and joint pain "without actual swelling associated with lupus." A motor examination conducted by Dr. Rezaian in 2010 "revealed no abnormal tone or movements and 5/5 strength without atrophy." A musculoskeletal examination conducted by Dr. Rezaian in August of 2011 revealed "5/5 muscle strength and normal gait, station, and muscle tone."

The ALJ also discussed evidence that contradicts Ms. Schartiger's subjective allegations of debilitating pain and stiffness. For example, despite Ms. Schartiger's continuous complaints of joint pain and swelling to Dr. Rezaian in 2010, she denied joint pain, joint swelling, muscular weakness, back pain, and neck pain during an examination by her neurologist. In addition, during the entire period that Dr. Rezaian was treating Ms. Schartiger, she cared for two children, volunteered at school, actively tried to get pregnant, joined a gym, and reported substantial physical activity. In January 2012, she reported that she was kickboxing.

Thus, it is clear from the record that the ALJ appropriately declined to assign controlling weight to Dr. Rezaian's opinion. The ALJ identifies the opinion as being from Ms. Schartiger's "treating rheumatologist" indicating that she was aware this was a treating-source opinion. Additionally, the ALJ expressly stated that the opinion is "not supported by the record evidence as a whole" and that it is based only on "diagnostic impressions." Moreover, the ALJ's detailed analysis of the evidence as a whole highlights the inconsistencies between Dr. Rezaian's opinion as to Ms. Schartiger's substantial functional limitations and the other medical and testimonial evidence.

Additionally, the undersigned finds that the ALJ properly weighed Dr. Rezaian's opinion in accordance with the regulations. Although Ms. Schartiger is correct that the ALJ did not specifically indicate how she considered and applied each of the factors in 20 CFR 416.927, neither the regulations nor applicable case law require the ALJ to specifically discuss each factor in such a mechanical fashion. All that is required by the regulations is that the ALJ provide an explanation for the weight she assigns to a medical opinion that is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and

the reasons for that weight." SSR 96-2p; *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("That the ALJ did not explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him does not prevent this court from according his decision meaningful review. [Claimant] cites no law, and we have found none, requiring an ALJ's decision to apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."); *Strickland v. Astrue*, 2011 WL 4021156 (S.D.W. Va. Sept. 9, 2011) (succinct explanation is legally sufficient "when considered in the context of the ALJ's entire decision" and the specific reasons given "correlate directly to several of the factors specified in [the] regulations"); *Wiltz v. Commissioner of Social Security Admin.*, 412 F.Supp.2d 601, 608 (E.D. Tex. Dec. 20, 2005) ("[20 C.F.R. 416.927(d)] requires only that the adjudicator 'consider' the factors. Neither the regulation nor interpretive case law requires that an ALJ specifically name, enumerate, and discuss each factor in outline or other rigid, mechanical form. Thus, mindful of a general duty of deference to the Commissioner's decisions, reviewing courts should examine the substance of an ALJ's decision, rather than its form.").

Here, the ALJ started her analysis of the evidence by stating that she "considered opinion evidence in accordance with the requirements of 20 CRF 404.1537 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." Thus, she was aware of the correct legal standards governing her consideration of opinion evidence. *See Tucker v. Astrue*, 897 F.Supp.2d 448, 468 (S.D.W.V. Sept. 27, 2012) (finding similar statemnet evidence that ALJ "complied with the governing mandates in his consideration of the opinions"); *Strickland* ("[I]t is notable that in his decision the ALJ explicitly states that he considered opinion evidence in accordance, *inter alia*, with 20 C.F.R. §§ 404.1527 and Social Security Ruling 96–2P, a fact which leaves no doubt that he was mindful of the correct legal

standards in reaching his decision."). Additionally, when evaluated in context with the entire decision, the ALJ's explanation for the weight she gave Dr. Rezaian's opinion is "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. The ALJ expressly indicated that she gave Dr. Rezaian's opinion "little weight." Moreover, it is clear from the record that the ALJ recognized that Dr. Rezaian was a treating physician and that he had an extensive treatment relationship with Ms. Schartiger. It is equally clear that the ALJ examined the consistency of the opinion with the rest of the record. In fact, the ALJ specifically enumerates the opinion's many contradictions with the record evidence as a as one of the reasons for assigning it only little weight. The ALJ also considered the supportability of the opinion as shown by her discussion throughout her decision regarding Dr. Rezaian's "diagnostic impressions." The ALJ provided good reasons in her decision for the weight she gave to Dr. Rezaian's opinion. Nothing more was required.

In sum, the ALJ analyzed all of the pertinent evidence and sufficiently explained her reasons for crediting or discrediting certain evidence. Accordingly, the ALJ's RFC determination is supported by substantial evidence.

*3. Whether the ALJ's Determination that Ms. Schartiger Could Perform Her Past Relevant Work Is Supported by Substantial Evidence?*

Finally, Ms. Schartiger contends that the ALJ erred in determining at step four that she was capable of performing past relevant work as a telemarketer because her past work as a telemarketer does not qualify as past relevant work. The Commissioner argues that substantial evidence supports the ALJ's finding that Ms. Schartiger could perform past work at the semi-skilled sedentary level of exertion. Additionally, the Commissioner asserts that even if Ms. Schartiger had no past relevant

work she could now perform, the ALJ also found at step five that other work existed the Ms. Schartiger could do given her RFC.

At the fourth step of the sequential evaluation process, the ALJ must "compare [the] residual functional capacity assessment...with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 416.920(f). Past relevant work is defined as work the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b). If the ALJ determines that the claimant can still do that kind of work, then the claimant is not disabled. On the other hand, if the ALJ finds that the claimant cannot do her past relevant work, or if the claimant has no past relevant work, then the ALJ proceeds to step five and determines whether the claimant can perform any other work considering the claimant's RFC and other vocational factors, such as age, education, and work experience. 20 C.F.R. § 416.920(g).

Here, the ALJ found that Ms. Schartiger had past relevant work as a cashier, assistant manager, hand sewer, travel clerk, and telemarketer. Next, the ALJ "compar[ed] the claimant's residual functional capacity with the physical and mental demands of this work" and found "consistent with the opinion of the vocational expert, that the claimant is able to perform the job of Telemarketer...as actually and generally performed." While this finding alone would have been sufficient for the ALJ to find Ms. Schartiger not disabled, the ALJ continued in the analysis stating, "[a]lthough the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform. Therefore, I make the following alternative findings for step five of the sequential evaluation process." The ALJ then listed three such jobs that Ms. Schartiger could perform: referral clerk, telephone clerk, and document preparer.

Ms. Schartiger argues that there is no evidence in the record that she worked as a telemarketer at the substantial gainful activity level, which in 2002 meant that she earned at least $780 per month. However, the record clearly shows that Ms. Schartiger did work as a telemarketer in 2002. She listed the job of telemarketer on a disability report and noted that she worked at the job six hours per day, five days per week, at a pay rate of $7.00 per hour. (R. 318.) Additionally, Ms. Schartiger testified at the second hearing that she worked as a telemarketer for "two months maybe." (R. 54.) Thus, there is certainly some evidence in the record that Ms. Schartiger had past relevant work as a telemarketer.

However, it is unnecessary for the undersigned to determine whether the ALJ correctly determined that Ms. Schartiger's past work as a telemarketer qualifies as "past relevant work" for the purposes of step four of the process. As noted above, the ALJ did not stop her analysis at step four; rather, she made an alternative finding at step five that other jobs existed in the national economy that Ms. Schartiger could perform. Thus, even if the ALJ erred in determining that Ms. Schartiger had past relevant work as a telemarketer, that error is harmless. *See, e.g., Clark v. Colvin*, 2014 WL 129228 (E.D.Va. Jan. 14, 2014) (finding error at step four harmless where ALJ made an alternative finding at step five).

## IV.  RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.     Ms. Schartiger's Motion for Summary Judgment be **DENIED**.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985): *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).


DATED: January 30, 2014                          /s/ *James E. Seibert*
                                                 JAMES E. SEIBERT
                                                 UNITED STATES MAGISTRATE JUDGE